[No. 52609–5. En Banc. December 10, 1987.]

*In the Matter of the Guardianship of* BARBARA GRANT, JUDITH GRANT, *Appellant,* HUGH M. ROBINSON, *Respondent.*

*Cathy Blinka* and *Lonnie Davis,* for appellant.

*Hugh M. Robinson,* pro se.

CALLOW, J.—This case involves the situation of Barbara Grant, an individual suffering from the incurable neurological disorder known as Batten's disease. Barbara's mother and legal guardian, Judith Grant, sought a court order that would authorize the future withholding of mechanical or artificial life sustaining procedures from Barbara. The trial court denied the request, and Judith Grant appealed directly to this court. Following oral argument, we issued an order reversing the trial court's decision. The order provided:

> The guardian, Judith Grant, natural mother of Barbara Grant, is authorized to approve and direct the withholding of life sustaining procedures utilizing mechanical or other artificial means including cardiopulmonary resuscitation, defibrillation, the use of a respirator, intubation, the insertion of a naso–gastric tube, and intravenous nutrition and hydration.

With this opinion we state the reasons for our ruling.

Barbara Grant is one of four children of Judith and Gary Grant. Barbara, now 22 years old, is afflicted with the terminal illness known as Batten's disease. Her brothers, Edward (24) and Jeffrey (18), are also afflicted with this disease. Only her sister, Joy Lynn (15), is not similarly afflicted.

Batten's disease is a genetic, neurological, degenerative condition of the central nervous system. There is no known cure. Most victims die in their teens or early twenties.

Victims of the disease usually start life as normal appearing children. The first symptom is a problem with vision, followed by epileptic seizures and a loss of motor control which causes the child to stagger. Later, the child has speech difficulties. Eventually the child can no longer walk or talk and is completely blind. Batten's disease also

causes severe mental retardation, with intellectual functions progressively failing. The child develops difficulty with swallowing, caused by a loss of voluntary muscle control. Brain control of the heart and lungs deteriorates, initially causing irregular heart rate and breathing, and finally, cardiac or respiratory arrest. Ultimately the child's vital functions fail, resulting in death.

Barbara Grant has followed the typical pattern of Batten's disease. She was a normal child with, at first, normal to above average intelligence. At age 5 she began to have vision problems. By 1978, when Barbara was 14, her parents could no longer meet her special needs and she was admitted to the Rainier State School in Buckley, Washington. Barbara's brother Edward, also afflicted with Batten's disease, moved with her to the school. At this time, Barbara was declared legally incompetent and her mother was appointed as her legal guardian.

When she arrived at the school in 1978, Barbara was blind, somewhat verbal, able to answer questions, and able to take care of herself in terms of self–help skills and feeding. She was walking with light assistance. She was described as moderately retarded, with a mental age of 6 years. Since then her condition has deteriorated dramatically.

Dr. Albert de Vera became Barbara's primary care physician in June 1984. He testified that by this time, Barbara was not only blind, but also had difficulty swallowing, virtually no speech or voluntary movements, and epileptic seizures from two to nine times a month. These findings are corroborated by a psychological report filed in October 1984. Although Barbara was alert and responsive to stimulation, and could react to various sounds, she could barely communicate, being able to produce only "throaty noises, vowel sounds and high–pitched whines" that occasionally resembled the words "hi", "no", and "help". Her mental age was estimated at about 2 months.

During the next year, Barbara's condition continued to deteriorate. By October 1985, she had lost all of her self–

help skills. She could not walk or feed herself, and had urinary and bowel incontinence. She could not turn from side to side in bed, lying most of the time on her right side with her hands clenched or crossed and tightly pulled to her chest. She could not sit up in a wheelchair by herself, had no control over her head and only limited use of her hands. She had to be tied in bed to be restrained from harmful movement caused by seizures. She had more and more difficulty swallowing food.

Barbara's intellectual and cognitive functions had virtually disappeared toward the end of 1985. She was unable to respond to a standard intelligence test, and the psychologist at Rainier School estimated her mental age to be between 2 weeks and 1½ months. Barbara had, at most, only a fleeting awareness of her environment. Although she could still respond to sound, she showed little if any awareness of music. She would occasionally smile or laugh, but at inappropriate times. She could still feel sensation and respond to touch, and occasionally differentiate between people she liked and disliked. However, she no longer responded at all to the presence of her father, mother, or brother, Edward.

Barbara's condition had also begun to affect the autonomic respiratory and cardiac regulation centers of the brain. On one occasion in September 1985, her pulse rate dropped, her breathing became irregular and she started to pale. The medical nurse at Rainier School gave Barbara cardiopulmonary resuscitation and administered oxygen. Barbara was then transported to Harborview Medical Center in Seattle. After observing her for 4 hours, the physicians at Harborview determined that her respiratory distress was caused by Batten's disease, and that there was no further treatment that could improve her condition. Barbara was sent back to Rainier School that same night.

Physicians from both Rainier School and Harborview agree that Barbara is now in the latter stages of Batten's disease with no hope of improvement. Although they cannot state precisely when she will die, they agree that her

death in the near future is inevitable. Paul Hageman, staff physician at Rainier School, testified, "I believe Barbara will die shortly from this disease." Dr. Hageman further stated that Barbara is "near death being nearly comatose . . ." R. H. A. Ruvalcaba, clinical director at Rainier School, testified that Barbara is in the terminal stages of the disease and "in an almost vegetative state with little if any response to human contact." Dr. de Vera, Barbara's primary treating physician at Rainier School, stated that she showed "clinical signs of progressive deterioration that appear to herald the terminal stages of her disease". Dr. Oscar Erikslund, another physician at Rainier, testified that her death could come "at any time;" and Dr. Michael Copass of Harborview stated that, based on his knowledge of Barbara's condition, he expects she will die soon.

Barbara Grant is no longer capable of expressing how she feels about her life. In addition, she has never explicitly expressed her desires regarding the use of life sustaining medical treatment should that become necessary in the future. Her mother believes she would not want such treatment, based partly on the fact that Barbara has shown a dislike for taking medication, being made to use a cane, and having suction tubes used on her, and also because Barbara has shown a dislike for the medical staff. Barbara's mother said she also believes that Barbara is prepared for her death. Father James Boyle, the chaplain at Rainier School, concurs. He has known Barbara and her family, who are devout Catholics, for almost 10 years. He said he has spoken often to Barbara, and that she understood she would die at an early age. Father Boyle believes that Barbara has come to accept death and looks at her life as a gift which she has a right to give back to God.

Barbara's mother testified that she wants Barbara to die as naturally and peacefully as possible, without the application of intrusive medical treatment to merely delay the inevitable. She stated, "I think it's time for man to stand back and let God take over." Barbara's father expressed the same view, as have other members of her immediate family.

On October 2, 1985, Judith Grant, Barbara's mother, moved in Pierce County Superior Court for an "Order Authorizing the Withholding of Life Support Systems" from her daughter. Although the order does not specify which means of life support the Grants wish to have withheld, their brief before this court indicates that they do not want the following to be used if Barbara should suffer either cardiac or respiratory arrest or if she should lose her ability to swallow: (1) cardiopulmonary resuscitation; (2) a defibrillator (used to revive the heart); (3) an artificial respirator; (4) intubation (insertion of a tube down the throat to the lungs for breathing); (5) a nasogastric tube (nose–to–throat tube for artificial feeding); and (6) intravenous feeding.

The Grants sought the present order because Rainier, a state–operated school, had a stated policy of using all measures necessary to sustain the life of an individual and, if the necessary treatment was not available at Rainier, to transport the individual to another hospital where treatment was available. The attorney general representing Rainier School stated, however, that the school would follow the guardian's wishes if the court entered an order upholding the Grants' motion.

Prior to the trial court hearing on this matter, a guardian ad litem and a separate "attorney for Barbara Grant" were appointed. At the hearing, Judith Grant, Barbara's immediate family, and the guardian ad litem all asked to have life support systems withheld. Hugh Robinson, the "attorney for Barbara Grant", was the only person to oppose this motion.

The trial court denied the motion to withhold life support systems. The court ruled the action "premature" because (1) Barbara's condition, although terminal and incurable, had not yet degenerated to a comatose or vegetative state; and (2) Barbara was not yet faced with the need for intrusive medical procedures. The court also ruled that any relief it might grant would not be binding on "the State" (*i.e.*, Rainier School) since it was not a party to the

proceeding. Judith Grant appealed directly to this court and we accepted review.

I

The first issue presented is whether an incompetent patient in an advanced stage of a terminal and incurable illness, suffering severe and permanent mental and physical deterioration, has the right to have life sustaining treatment withheld. It is now well established that this right extends to persons who are in an irreversibly comatose or persistent vegetative state, with no reasonable chance of returning to a sapient state. *In re Colyer*, 99 Wn.2d 114, 660 P.2d 738 (1983); *In re Hamlin*, 102 Wn.2d 810, 689 P.2d 1372 (1984); *John F. Kennedy Mem. Hosp., Inc. v. Bludworth*, 452 So. 2d 921 (Fla. 1984); *In re Torres*, 357 N.W.2d 332 (Minn. 1984); *Barber v. Superior Court*, 147 Cal. App. 3d 1006, 195 Cal. Rptr. 484 (1983); *In re Severns*, 425 A.2d 156 (Del. Ch. 1980); *Leach v. Akron Gen. Med. Ctr.*, 68 Ohio Misc. 1, 426 N.E.2d 809 (C.P. 1980); *In re Dinnerstein*, 6 Mass. App. Ct. 466, 380 N.E.2d 134 (1978); *In re Quinlan*, 70 N.J. 10, 355 A.2d 647, *cert. denied sub nom. Garger v. New Jersey*, 429 U.S. 922 (1976). *See also Foody v. Manchester Mem. Hosp.*, ___ Conn. Supp. ___, 482 A.2d 713 (1984) (life sustaining treatment could be withheld from semicomatose patient described as "awake but unaware"). We stated in *In re Colyer, supra* at 120:

> an adult who is incurably and terminally ill has a constitutional right of privacy that encompasses the right to refuse treatment that serves only to prolong the dying process, given the absence of countervailing state interests.

At page 123 we said:

> A death which occurs after the removal of life sustaining systems is from natural causes, neither set in motion nor intended by the patient.

and at page 124, we stated:

> A competent patient may refuse treatment under the informed consent doctrine. RCW 7.70.050. Moreover, a competent patient may ensure with a directive that life

sustaining treatment will be withheld or withdrawn, should he or she subsequently become incompetent. RCW 70.122.

An incompetent's right to refuse treatment should be equal to a competent's right to do so.

Barbara Grant, although suffering from Batten's disease, had not yet degenerated into an irreversibly comatose or vegetative state at the time this matter came before the trial court. The trial court held that the motion to withhold life sustaining treatment was therefore "premature." We disagree.

We note at the outset that this State's Natural Death Act (RCW 70.122) is inapplicable. The act authorizes a competent adult to sign a directive requiring that life sustaining treatment be withheld or withdrawn should he or she suffer from a terminal and incurable condition. RCW 70.122-.030(1). As Barbara Grant was adjudicated incompetent at age 14, she was unable to avail herself of the act's provisions.

■■ This does not end the inquiry, however, for the right to refuse life sustaining treatment is not a mere creation of statute. Rather, it stems from both the constitutional right of privacy[1] and the common law right to be free of bodily invasion. *Colyer*, at 119–22. As to the former, we have noted:

> The decision by the incurably ill to forego medical treatment and allow the natural processes of death to follow their inevitable course is so manifestly a "fundamental" decision in their lives, that it is virtually inconceivable that the right of privacy would *not* apply to it.

*Colyer*, at 120 (quoting *In re Eichner*, 73 A.D.2d 431, 459,

---

[1]Many states have found this right as stemming from the federal constitutional right of privacy. *See, e.g., Superintendent of Belchertown State Sch. v. Saikewicz*, 373 Mass. 728, 739–40, 370 N.E.2d 417 (1977); *Quinlan*, at 38–40. We have relied on the federal constitution in our analysis, *In re Colyer*, 99 Wn.2d 114, 119–21, 660 P.2d 738 (1983), but we also recognized that the right to withhold life sustaining treatment stems independently from the explicit privacy guaranty in article 1, section 7 of our State Constitution. *Colyer*, at 120.

462 N.Y.S.2d 517 (1980), *modified on other grounds sub nom. In re Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981)). An incompetent individual does not lose the right to have life sustaining treatment withheld by virtue of his or her incompetency. *Hamlin,* at 816; *Colyer,* at 124. Thus, the remaining questions are whether the right to withhold life sustaining treatment extends to terminally ill but noncomatose persons such as Barbara Grant; and whether any state interests preclude the exercise of that right in this case.

Other courts have recognized that incompetent patients have the right to refuse life sustaining treatment even though they are not in a comatose or vegetative state. *See, e.g., Superintendent of Belchertown State Sch. v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977) (chemotherapy treatment could be withheld from a profoundly retarded and disoriented man suffering from leukemia, where the chemotherapy would not cure his disease but merely prolong his suffering); *In re Spring,* 380 Mass. 629, 405 N.E.2d 115 (1980) (life prolonging but noncurative hemodialysis treatment could be withheld from conscious but profoundly senile patient suffering from kidney disease); *In re Hier,* 18 Mass. App. Ct. 200, 464 N.E.2d 959 (1984) (surgery necessary for insertion of a stomach feeding tube could be withheld from incompetent person suffering from delusions and severe mental illness); *In re Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985) (right to terminate life sustaining treatment could be exercised on behalf of an incompetent person with serious and permanent mental and physical impairments and a life expectancy less than 1 year).

The American Medical Association likewise agrees that the presence of a comatose or vegetative state is not a prerequisite for the withholding of life sustaining procedures:

> The social commitment of the physician is to sustain life and relieve suffering. Where the performance of one duty conflicts with the other, the choice of the patient, or his family or legal representative if the patient is incompetent to act in his own behalf, should prevail. In the

absence of the patient's choice or an authorized proxy, the physician must act in the best interest of the patient.

For humane reasons, with informed consent, a physician may do what is medically necessary to alleviate severe pain, *or cease or omit treatment to permit a terminally ill patient whose death is imminent to die.* However, he should not intentionally cause death. In deciding whether the administration of potentially life–prolonging medical treatment is in the best interest of the patient who is incompetent to act in his own behalf, the physician should determine what the possibility is for extending life under humane and comfortable conditions and what are the prior expressed wishes of the patient and attitudes of the family or those who have responsibility for the custody of the patient.

Even if death is not imminent but a patient's coma is beyond doubt irreversible and there are adequate safeguards to confirm the accuracy of the diagnosis and with the concurrence of those who have responsibility for the care of the patient, it is not unethical to discontinue all means of life–prolonging medical treatment.

(Italics ours.) Statement of the AMA Council on Ethical and Judicial Affairs, "Withholding or Withdrawing Life Prolonging Medical Treatment", March 15, 1986. *Accord,* Smith, *Hospital Liability* § 1302[2], at 13–24 to 13–26 (1986). In earlier pronouncements, the AMA has stated that cardiopulmonary resuscitation—one form of life sustaining treatment—may be withheld "in cases of terminal irreversible illness where death is not unexpected or where prolonged cardiac arrest dictates the futility of resuscitation efforts." 244 J. A.M.A. 506 (1980); 227 J. A.M.A. 864 (1974). *See also* D. Meyers, *Medico–Legal Implications of Death and Dying* § 9.6, at 203–04 (1981).

The trial court placed great weight on the fact that Barbara Grant, while terminally ill and severely impaired both physically and mentally, is apparently not in pain at the present time. The trial court evidently believed that a noncomatose individual must be suffering from pain before the right to withhold life sustaining treatment can attach. We do not agree. Certainly, the amount of pain endured by a dying patient is a significant factor to be considered, but

not the only factor. The individual's right to die with dignity must not be ignored. As one court has noted, a terminally ill patient may wish to avoid not only prolonged suffering, but also "[t]he ultimate horror . . . of being maintained in limbo, in a sterile room, by machines controlled by strangers." *In re Torres,* 357 N.W.2d 332, 340 (Minn. 1984).

We hold, therefore, that in the absence of countervailing state interests, a person has the right to have life sustaining treatment withheld where he or she (1) is in an advanced stage of a terminal and incurable illness, and (2) is suffering severe and permanent mental and physical deterioration. We have previously indicated four state interests which might militate against allowing the exercise of this right in any particular case. Those interests are: (1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession. *In re Colyer,* 99 Wn.2d 114, 122, 660 P.2d 738 (1983). None of these interests are present here.

The State's interest in preserving life may require *life-saving* treatment for patients who have not consented to it being withheld. This interest weakens considerably, however, if treatment will merely postpone death for a person with a terminal and incurable condition. Where the treatment required will be highly invasive and intrusive, the terminally ill individual's right to refuse treatment (or have it withheld in his or her behalf) must prevail. *Colyer,* at 122-23.

The State's interest in protecting third parties is likewise not involved. Barbara Grant has no relatives or dependents who will be adversely affected by a decision to withhold life sustaining treatment. Moreover, Barbara's mother (and guardian), father, and immediate family have all concurred that such a decision would be in Barbara's best interests. Nor is the State interest in preventing suicide violated. As we have stated "[a] death which occurs after the removal of life sustaining systems is from natural causes, neither set in

motion nor intended by the patient." *Colyer,* at 123.

Finally, the State's interest in the maintenance of the ethical integrity of the medical profession will not be adversely affected. Recent pronouncements of medical authorities recognize that the right to withhold life sustaining treatment should not be limited to patients in a comatose or vegetative state. More generally, as observed in *Colyer:*

> [T]he prevailing ethical practice seems to be to recognize that the dying are more often in need of comfort than treatment. Recognition of the right to refuse necessary treatment in appropriate circumstances is consistent with existing medical mores; such a doctrine does not threaten either the integrity of the medical profession, the proper role of hospitals in caring for such patients or the State's interest in protecting the same. It is not necessary to deny a right of self–determination to a patient in order to recognize the interests of doctors, hospitals, and medical personnel in attendance on the patient.

*Colyer,* at 123 (quoting *Saikewicz,* at 743–44).

## II

The next issue is whether the motion to withhold life sustaining treatment from Barbara Grant is "premature" because she is not presently faced with the need for such treatment. The trial court held that "[t]he proper time to make a decision is when the case is before the doctors", and "[i]f this order were issued now, it would be analogous to prior restraint."

We disagree. At this time, we know much about Barbara's condition. She is in the latter stages of Batten's disease, which is characterized by progressive deterioration of the brain functions that control the heart and lungs and progressive difficulty with swallowing. Her physicians all agree that she has a high likelihood of suffering either cardiac or respiratory arrest, or of altogether losing her ability to swallow. If this occurs, one or more life sustaining procedures will have to be invoked to save Barbara's life. This could include use of cardiopulmonary resuscitation, a

defibrillator, a respirator, intubation for breathing, insertion of a nasogastric tube, or use of intravenous feeding. The fact that the physicians cannot now state precisely which measures will be necessary does not render the Grants' concerns purely speculative.

More importantly, the trial court's resolution of this matter would effectively deny Barbara Grant the right to withhold life sustaining procedures altogether. Certainly, in the case of cardiac or respiratory arrest, a decision on whether to resort to life sustaining procedures will have to be made immediately; there will be no time to get court authorization to withhold treatment once an emergency arises. Rainier School has stated that it will employ whatever measures necessary to save Barbara's life without such authorization. Thus, the school will treat her body by artificial means unless ordered not to do so. The result is that while purporting to delay a decision until a more appropriate time, the trial court's ruling is actually a decision by default. Barbara Grant's only right under that ruling would be to have life sustaining procedures *withdrawn* after they have been commenced.

Modern medical authority clearly dictates, however, that no distinction should be made between withdrawing medical treatment and prospectively withholding such treatment in the first instance. *See, e.g.,* President's Comm'n for the Study of Ethical Problems in Medicine and Biomedical & Behavioral Research, *Deciding To Forego Life–Sustaining Treatment* 73–77 (1983) (hereafter *Presidential Comm'n Report*); D. Meyers, *Medico–Legal Implications of Death and Dying* § 9.6, at 200–01 (1981). Prior decisions of both this court and other courts are in accord with this view. *See In re Hamlin,* 102 Wn.2d 810, 689 P.2d 1372 (1984) (cardiopulmonary resuscitation could be withheld from irreversibly comatose patient); *In re Dinnerstein,* 6 Mass. App. Ct. 466, 380 N.E.2d 134 (1978) (cardiopulmonary and respiratory resuscitation could be withheld from patient in an essentially vegetative state and suffering from Alzheimer's disease); *In re Conroy,* 98 N.J. 321, 369–70, 486

A.2d 1209 (1985) (no distinction is to be made between the withholding and the withdrawing of treatment). Moreover, we note also that our Legislature, in enacting this State's Natural Death Act, has recognized the right of a competent patient to direct the "*withholding* or withdrawal" of life sustaining treatment should he or she suffer from a terminal and incurable condition. (Italics ours.) RCW 70.122-.030(1). It would be anomalous to deny this same right to an incompetent, terminally ill patient such as Barbara Grant.

We therefore hold that the present motion is not "premature" merely because it prospectively requests the withholding of life sustaining procedures. A person in an advanced stage of a terminal and incurable illness suffering severe and permanent mental and physical deterioration is entitled to have life sustaining treatment withheld or withdrawn.

## III

Judith Grant has specifically requested that nasogastric tubes and intravenous feeding be withheld in the event her daughter loses the ability to swallow because of Batten's disease. We thus must determine whether the right to withhold life sustaining treatment includes the right to withhold artificial means of nutrition and hydration. The issue presented here has only recently been addressed by courts, commentators and the medical profession.

There are some who favor requiring the provision of nutrition and hydration to all patients in all circumstances. To do otherwise, it is argued, would deprive patients of the "ordinary" nursing care to which all persons are entitled. Horan & Grant, *The Legal Aspects of Withdrawing Nourishment*, 5 J. Legal Med. 595, 600–01 (1984); Smith, *Hospital Liability* § 13.03[1], at 13–32 (1986); *see* Comment, *Artificial Nutrition and the Terminally Ill: How Should Washington Decide?*, 61 Wash. L. Rev. 419, 421 (1986) (hereafter *Artificial Nutrition*). Food and water are basic necessities of life; indeed, they also carry tremendous emo-

tional significance. *In re Conroy,* 98 N.J. 321, 372, 486 A.2d 1209 (1985); *Barber v. Superior Court,* 147 Cal. App. 3d 1006, 1016, 195 Cal. Rptr. 484 (1983); *see Presidential Comm'n Report,* at 192 n.52. Thus, in the words of one commentator, "[t]he feeding of . . . [those who] are physically unable to feed themselves, is the most fundamental of all human relationships." Callahan, *On Feeding the Dying,* 13 Hastings Center Rep. 22 (1983).

At the same time, however, we must recognize that nasogastric tubes and intravenous infusions are significantly different from typical human ways of providing nutrition. These procedures may be likened to the use of an artificial respirator; in each instance an artificial or mechanical device is required to prolong life because the body is unable to perform a vital bodily function on its own. *Conroy,* at 373; *Barber,* at 1016; *Corbett v. D'Alessandro,* 487 So. 2d 368, 371 (Fla. Dist. Ct. App. 1986). In addition, the patient is subjected to highly invasive and intrusive procedures. We have previously emphasized that the degree of bodily invasion is a significant factor to consider in determining whether life support systems may be withheld. *Colyer,* at 122–23. This is especially true where a terminally ill patient may well object to having his or her life prolonged through the use of tubes and forced injections.

Furthermore, advanced methods of providing nutrition and hydration, while often safe, are not without risks. These are sophisticated medical procedures whose benefits must be weighed against their burdens. Serious complications can arise from the use of nasogastric tubes and intravenous infusions. Nasogastric tubes can cause painful irritation and discomfort, bleeding, infection, and even pneumonia. Physical restraints or sedation may be required to prevent incompetent patients from pulling out their tubes. With intravenous infusion there is the danger that veins will become infected, irritated, inflamed or collapse. This is especially true if the patient must receive all of his or her nourishment intravenously. In such cases, ordinary

I.V. lines are insufficient and a special catheter may have to be surgically inserted into one of the major veins of the chest. Patients receiving intravenous infusions also must often be physically restrained. Lynn & Childress, *Must Patients Always Be Given Food and Water?*, 13 Hastings Center Rep. 17, 18 (1983); Dresser & Boisaubin, *Ethics, Law, and Nutritional Support,* 145 Archives of Internal Med. 122, 122–23 (1985); Lo & Dornbrand, *Sounding Board: Guiding the Hand That Feeds: Caring for the Demented Elderly,* 311 New Eng. J. Med. 402, 403 (1984); Meguid, Eldar & Wahba, *The Delivery of Nutritional Support: A Potpourri of New Devices and Methods,* 55 Cancer 279, 280–87 (Supp. 1985); *Artificial Nutrition,* 61 Wash. L. Rev. at 424–26 and accompanying notes; *Conroy,* at 373.

The possibility that the denial of nutrition or hydration may cause pain and suffering must also, of course, be considered. In many cases provision of artificial nutrition and hydration may provide comfort to the dying. However, it is no longer clear that dehydration and malnourishment will always be distressful to a terminally ill patient. As two commentators note, "Clinicians and researchers are just beginning to explore the complex effects nourishment and even hydration can have on terminally ill patients." Dresser & Boisaubin, at 124. Patients who are near death and not receiving nourishment may, in fact, be more comfortable than comparable patients who receive conventional amounts of nutrition and hydration. *See* Lynn & Childress, at 19; Zerwekh, *The Dehydration Question,* Nursing 47, 49–51 (1983); Dresser & Boisaubin, at 124. In other cases, the pain, if any, may be reduced significantly through the use of drugs or medication. "[P]resently available drugs and techniques allow pain to be reduced to a level acceptable to virtually every patient, usually without unacceptable sedation." *Presidential Comm'n Report,* at 50–51. Thus, several authorities now agree that in appropriate cases, artificial means of feeding may properly be withheld from terminally ill patients. Dresser & Boisaubin, at 124;

Lynn & Childress, at 21; Lo & Dornbrand, at 403–04; Wanzer, et al, *The Physician's Responsibility Toward Hopelessly Ill Patients*, 310 New Eng. J. Med. 955, 958–59 (1984) (authors state that this applies to terminally ill patients who are "severely and irreversibly demented").

The American Medical Association reached a similar conclusion in its recent statement entitled "Withholding or Withdrawing Life Prolonging Medical Treatment":

> Life–prolonging medical treatment includes medication and artificially or technologically supplied respiration, nutrition or hydration. In treating a terminally ill or irreversibly comatose patient, the physician should determine whether the benefits of treatment outweigh its burdens. At all times, the dignity of the patient should be maintained.

Statement by the AMA Council on Ethical and Judicial Affairs, March 15, 1986. *Accord, Presidential Comm'n Report,* at 3, 90, 288. In addition, all of the court decisions which have dealt with the issue of artificial feeding have concluded that this form of life support should be evaluated in the same manner as any other artificial means of life support. *See Conroy,* at 374; *Brophy v. New Eng. Sinai Hosp., Inc.,* 398 Mass. 417, 435–38, 497 N.E.2d 626 (1986); *Hier* (Mass. Ct. App.), at 207–08; *Corbett* (Fla. Dist. Ct. App.), at 371–72; *Barber* (Cal. App.), at 1016–17; *Bouvia v. Superior Court,* 179 Cal. App. 3d 1127, 1141, 225 Cal. Rptr. 297 (1986); *In re Severns,* 425 A.2d 156, 160 (Del. Ch. 1980). In *Delio v. Westchester Cy. Med. Ctr.,* 129 A.D.2d 1, 516 N.Y.S.2d 677 (1987) the court in reversing a trial court decision relied upon *Conroy* and *Brophy* as well as a number of the other decisions we have cited and concluded:

> In our review of the decisions in other jurisdictions we failed to uncover a single case in which a court confronted with an application to discontinue feeding by artificial means has evaluated medical procedures to provide nutrition and hydration differently from other types of life–sustaining procedures. . . .
>
> . . . [T]he withdrawal or withholding of feeding by artificial means should be evaluated in the same manner

as any other medical procedure. In this respect, we view nutrition and hydration by artificial means as being the same as the use of a respirator or other form of life support equipment.

(Citations omitted.) *Delio,* 516 N.Y.S.2d at 689.[2]

We agree with those courts that have addressed the problem. The right to have life sustaining treatment withheld extends to all artificial procedures which serve only to prolong the life of a terminally ill patient. The many variables that may be present in any particular case militate against a rule which would require providing artificial nutrition and hydration in all cases. Rather, the burdens and benefits of providing or withholding such treatment must be evaluated by the guardian, the immediate family and the physicians according to the circumstances of each case.

We emphasize that we are not endorsing suicide or euthanasia. Some have argued that to withhold artificial nutrition and hydration from a terminally ill patient is to actively cause his or her death by starvation. *Brophy,* at 442 (Nolan, J., dissenting). *See also* Callahan, *On Feeding the Dying,* 13 Hastings Center Rep. 22 (1983); Siegler & Weisbard, *Against the Emerging Stream: Should Fluids and Nutritional Support Be Discontinued?,* 145 Archives of Internal Med. 129 (1985). This approach misconceives

---

[2]The opinion includes the following:

"Father Andrew Varga, a Jesuit priest and a professor of philosophy at Fordham University, testified as an expert on the ethical issues involved in the discontinuance of life-sustaining mechanisms in the event the patient lapsed into an irreversible vegetative condition. Father Varga testified that a Vatican document published in 1980 rejected the distinction between ordinary and extraordinary means of life support as a measure of when it would be ethical to discontinue those means of support; rather, the Vatican adopted a test of proportionality under which the measure of whether to discontinue life-sustaining mechanisms was whether those mechanisms would provide benefits to the patient greater than the burdens imposed on the patient, the family and others as a result. Father Varga testified that the discontinuance of nutrition and hydration presently furnished to Daniel by artificial means would be ethical and in accordance with Vatican doctrine since Daniel's condition is irreversible and maintaining him in his present condition places an enormous burden upon his family both economically and emotionally." *Delio,* 516 N.Y.S.2d at 683.

the plight of patients such as Barbara Grant. She is suffering from a disease which may eventually cause her to lose the ability to swallow if she has not died before the onset of that complication.[3] In other words, a vital bodily function may have to be performed by artificial means—most likely, by nasogastric tube or intravenous infusion. It is much the same if she should suffer cardiac or respiratory arrest. In the former instance, a defibrillator may be required to sustain her life; in the latter instance an artificial respirator may be necessary. Yet in none of these cases can the withholding of life sustaining devices be deemed the cause of Barbara's death. The cause of her death will be Batten's disease. As stated in *Colyer,* at 123, "[a] death which occurs after the removal of life sustaining systems is from natural causes, neither set in motion nor intended by the patient." The fact that here, artificial feeding devices are to be withheld rather than removed, does not alter the analysis.

It is suggested that this is a problem that should be addressed by the Legislature and we do not quarrel with that suggestion. The fact remains, however, that the petitioners have addressed the problem dealing with their daughter, her rights and desires, and their circumstances to this court, not the Legislature, and we must answer an immediate problem now not an academic problem at some future date. Further we note that the courts of California, Connecticut, Delaware, Massachusetts, New Jersey, New York and Ohio have acknowledged the individual common law right of a patient to refuse medical treatment in the form of nutrition and hydration by artificial means, subject to the protection of the interest of the State by the courts. These courts have proceeded absent any legislative pro-

---

[3]Such was the plight of the patient in *Delio v. Westchester Cy. Med. Ctr., supra.* The patient could not swallow because of the complete degeneration of the cortical cells but yet might be kept in a persistent vegetative state for many years. The court pointed out that the prolongation of a vegetative state, *by any means,* when the body cannot perform a vital bodily function on its own, endeavoring to distinguish mechanical breathing from mechanical hydration or nutrition, is a distinction without difference.

nouncement on the subject in their respective states, recognizing that people have the right to accept or reject such medical treatment as they desire. The courts have recognized that termination of artificial life support systems evinces only an intent to live or die free of unwanted mechanical devices and permit the processes of nature to run their course. *See Brophy, Conroy* and *Delio.* We cannot place our responsibility to decide this case upon the legislative branch of government. We have not done so before because of emotional considerations based upon an ignorance of medical reality. *In re Colyer,* 99 Wn.2d 114, 660 P.2d 738 (1983); *In re Hamlin,* 102 Wn.2d 810, 689 P.2d 1372 (1984). The prolongation of the existence of this vegetative state for possibly years to come by artificially placing liquids and nutrients into this body to the emotional and economic destruction of the survivors is a monstrous assault to the family concerned that we will not countenance.

We hold that the right of a terminally ill patient to have life sustaining procedures withheld includes the right to withhold nasogastric tubes, intravenous feeding, and other artificial means of nutrition and hydration.

## IV

As Barbara Grant has been incompetent since age 14, she necessarily could not enter a directive authorizing the withholding of life sustaining treatment under this State's Natural Death Act. The next question thus concerns the manner in which her right to refuse life sustaining treatment may be exercised. The trial court held that Judith Grant, Barbara's mother and legal guardian, was not empowered to make such treatment decisions, and therefore, the court would have to make a "substituted judgment" that Barbara would choose to refuse life sustaining treatment before such treatment could be withheld.

In two recent cases, we have considered this question as it pertains to the withdrawal of life sustaining treatment from irreversibly comatose patients. *In re Colyer,* 99 Wn.2d

114, 660 P.2d 738 (1983); *In re Hamlin,* 102 Wn.2d 810, 689 P.2d 1372 (1984). We stated that the judicial process is "an unresponsive and cumbersome mechanism for decisions of this nature". *Colyer,* at 127. We adhere to this view. We recognize that in so doing, we are declining to follow the procedures employed in Massachusetts whereby the court, through the exercise of "substituted judgment", is the ultimate arbiter of the incompetent patient's wishes or best interests with respect to the withholding and withdrawal of life sustaining treatment. *See, e.g., Brophy v. New Eng. Sinai Hosp., Inc.,* 398 Mass. 417, 497 N.E.2d 626 (1986); *In re Spring,* 380 Mass. 629, 405 N.E.2d 115 (1980); *Superintendent of Belchertown State Sch. v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977); *In re Hier,* 18 Mass. App. Ct. 200, 464 N.E.2d 959 (1984). We hold, however, that these decisions are best left, wherever possible, to the incompetent patient's guardian, immediate family and physicians.

We hold that prior court authorization to withhold life sustaining treatment shall not be required where all the following circumstances are present:

1. The incompetent patient's attending physician, together with two other physicians qualified to assess the patient's condition, determine with reasonable medical judgment that the patient is in an advanced stage of a terminal and incurable illness and is suffering severe and permanent mental and physical deterioration;

2. The incompetent patient's legal guardian, if one has been appointed,[4] determines that either (a) the patient, if competent, would choose to refuse life sustaining treat-

---

[4]The authority of the guardian to withhold or withdraw life sustaining treatment stems from RCW 11.92.040(3). *Colyer,* at 128; *Hamlin,* at 814–15. In *Hamlin,* at 818–19, we specifically noted that a guardian need not be appointed to make the decision to withhold life sustaining treatment *if* the incompetent patient's immediate family members all agree that such treatment should be withheld. Our holding today does not overrule this aspect of *Hamlin* in any way. We merely recognize that in some cases, a guardian will already have been appointed. (Here, Judith Grant, Barbara's mother, has also been her legal guardian since 1978.) In such cases, prior court authorization is not required where the guardian, immediate family members, physicians and the health care facility

ment; or, (b) if such a determination cannot be made, the guardian determines that the withholding of life sustaining treatment would be in the best interests of the patient;

3. No members of the incompetent patient's immediate family object to the decision to withhold such treatment;[5] and

4. Neither the patient's physicians nor the health care facility responsible for the care of the patient object to the decision to withhold such treatment.[6]

In determining whether life sustaining treatment should be withheld from an incompetent patient, the patient's guardian must first attempt to determine whether the patient would have made that same choice if competent. The guardian's familiarity with the incompetent patient's character and personality, general attitude toward medical treatment, and prior statements will assist in making this judgment. *Colyer,* at 131. The probative value of prior statements will vary, depending on the age and maturity of the incompetent patient, the context of the statements, and the connection of the statements to the debilitating event. *Colyer,* at 131–32. Where the patient has clearly expressed his or her wishes regarding the withholding of life sustaining treatment, these wishes must be given strong consideration, even if made while the patient was incompetent. *See In re Ingram,* 102 Wn.2d 827, 840, 689 P.2d 1363 (1984).

There will be many situations where it cannot be ascertained what choice the patient would make if competent. In

responsible for the care of the patient all agree as to the propriety of withholding life sustaining treatment.

[5] Where no guardian has been appointed, the patient's immediate family shall make the decision on whether to withhold life sustaining treatment by applying the criteria in 2 above.

[6] No health care provider should be required to participate in the withholding or withdrawing of life sustaining treatment if such an action or actions would be contrary to the dictates of their conscience or belief. On the other hand, no health care provider should interfere with the transfer of a patient to another health care provider if the guardian, immediate family and physician so direct.

such cases, the guardian must make a good faith determination of whether the withholding of life sustaining treatment would serve the incompetent patient's best interests. The following is a nonexclusive list of the factors which should be considered in making this determination:

> [E]vidence about the patient's present level of physical, sensory, emotional, and cognitive functioning; the degree of physical pain resulting from the medical condition, treatment, and termination of treatment, respectively; the degree of humiliation, dependence, and loss of dignity probably resulting from the condition and treatment; the life expectancy and prognosis for recovery with and without treatment; the various treatment options; and the risks, side effects, and benefits of each of those options.

*Conroy*, at 397 (Handler, J., concurring in part, dissenting in part).

Here, Barbara Grant's attending physician determined that she is in the advanced stages of Batten's disease, and suffering severe and permanent mental and physical deterioration; four other physicians agreed with this determination. Although Barbara has never been able to expressly indicate her desires regarding the use of life sustaining treatment, Barbara's mother has made a good faith determination that her daughter's best interests can be served only by withholding life sustaining treatment in the future. Her immediate family members agree that this is the proper and most humane decision.

A court order to withhold life sustaining treatment was necessary here, in light of Rainier School's stated policy of taking all measures necessary to sustain the life of patients under its care. We granted the order to effectuate the wishes of Barbara's legal guardian and her immediate family members. In so doing, we stress that Rainier has indicated (through its representative, the State Attorney General) that it would not object to withholding life sustaining treatment *if* a court order to that effect were obtained.

## V

■ Finally, the trial court held that because Rainier School is operated by the State, and because the State was not joined as a party in this case, any decision by the court would not be binding on the State. Essentially, the trial court ruled that the State was a necessary party that must be joined under CR 19. That rule mandates joinder of a party if:

> (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (A) as a practical matter impair or impede his ability to protect that interest or (B) leave any of the persons already parties subject to a substantial risk of incurring . . . inconsistent obligations . . .

However, a party may waive its right to joinder, particularly if the party indicates its willingness to rely on the effort of another party who has been joined. *See Smith v. State Farm Fire & Cas. Co.,* 633 F.2d 401, 405 (5th Cir. 1980). Here the attorney general representing Rainier School testified that the school would agree to follow the guardian's wishes if a court order were issued in favor of the guardian. Thus, there is no interest of Rainier's that will be left unprotected by a decision of this court. Joinder of the State under CR 19 was not necessary.

The advance of medical science and technology has made it possible to prolong the activity of the human body's vital functions beyond natural limits, often beyond the time when the patient is conscious and the possibility of recovery gone. The order previously entered stated:

> (2) The guardian, Judith Grant, natural mother of Barbara Grant, is authorized to approve and direct the withholding of life sustaining procedures utilizing mechanical or other artificial means including cardiopulmonary resuscitation, defibrillation, the use of a respirator, intubation, and insertion of a naso–gastric tube, and intravenous nutrition and hydration.

That order granted the right to die naturally, peacefully and with dignity.

PEARSON, C.J., and UTTER and DOLLIVER, JJ., concur.

ANDERSEN, J. (concurring in part, dissenting in part)— The majority allows the life of this unfortunate young woman, Barbara Grant, to be terminated by authorizing removal of artificial life support systems. I concur with that part of the majority decision because it allows the patient's family to make the decision for her that the Natural Death Act (RCW 70.122) would have permitted her to make for herself had she been competent and conscious. Such decisions are well within the traditional functions of probate courts handling guardianships of incompetent persons.

I disagree, however, with the majority's further decision which allows the patient's life to be taken by withholding intravenous nutrition and hydration or, to use less polite phraseology, to let her die of thirst or starvation. Call it whatever the majority will, this is pure, unadorned euthanasia.[7] It is a step upon a slippery slope, one that I would not take. If mores have changed to the extent that such conduct can now be sanctioned, I would let that change arrive through the moral judgment of the people as expressed through their duly elected legislators, not by the expedience of judicial fiat.

Accordingly, I would defer this part of the order until such time as the Legislature may authorize it. The Legislature had this identical issue under serious consideration at a recent legislative session and would undoubtedly consider it again except, perhaps, for the majority's holding in the present case.

My reasons are these.

As infants, we were given food and drink when we were too helpless to nourish ourselves. And for many of us, as

---

[7]"Euthanasia" has been defined as "the act or practice of painlessly putting to death persons suffering from incurable conditions or diseases". *Webster's Third New International Dictionary* 786 (1971).

with the patient in this case, a day will come before we die when we are once again too helpless to feed ourselves. All living beings need food and water in order to live, but such nourishment does not itself heal or cure disease. When we stop feeding the permanently unconscious patient, we are not withdrawing from the battle against any illness or disease; we are withholding the nourishment that sustains all life.

Mark Siegler, M.D., and Alan J. Weisbard, J.D., have recently written a particularly perceptive piece for a prestigious medical journal, urging doctors and family members to exercise less haste and more consideration before deciding to discontinue fluids and nutritional support. As they observe:

> The powerful rhetoric of "death with dignity" has gained intellectual currency and practical importance in recent years. Initially, this rhetoric was a plea for more humane and individualized treatment in the face of the sometimes cold and impersonal technologic imperatives of modern medicine. As such, it brought needed attention to the plight of dying patients and prompted legal and clinical changes that empowered such patients (and, at times, their representatives) to assert some control over the manner, if not the fact, of their dying. The death with dignity movement has advanced to a new frontier: the termination or withdrawal of fluids and nutritional support.
>
> As recently as five years ago, or perhaps three, the idea that fluids and nutriment might be withdrawn, with moral and perhaps legal impunity, from dying patients, was a notion that would have been repudiated, if not condemned, by most health professionals. They would have regarded such an idea as morally and psychologically objectionable, legally problematic, and medically wrong. The notion would have gone "against the stream" of medical standards of care. [However,] . . . this practice is receiving increased support from both physicians and bioethicists. This new stream of emerging opinion is typically couched in the language of caution and compassion. But the underlying analysis, once laid bare, suggests what is truly at stake: That for an increasing number of patients, the benefits of continued life are perceived as

insufficient to justify the burden and cost of care; that death is the desired outcome, and—critically—that the role of the physician is to participate in bringing this about.

This is an unexpected development and one that runs counter to the traditions of medical care. We feel compelled to speak out to prevent the all-too-rapid acceptance of this new emerging standard medical practice, that of withdrawing fluids or nutritional supports from some classes of patients. This development may threaten patients, physicians, the patient-physician relationship, and other vital societal values. While we recognize that particular health care professionals, for reasons of compassion and conscience and with full knowledge of the personal legal risks involved, may on occasion elect to discontinue fluids and nutritional support, we, nevertheless, believe that such actions should generally be proscribed, pending much fuller debate and discussion than has yet taken place.

Siegler & Weisbard, *Against the Emerging Stream: Should Fluids and Nutritional Support Be Discontinued?*, 145 Archives of Internal Med. 129 (1985).

These same authors also pose this grim warning:

We have deep concerns about accepting the practice of withholding fluids from patients, because it may bear the seeds of unacceptable social consequences. We have witnessed too much history to disregard how easily a society may disvalue the lives of the "unproductive." The "angel of mercy" can become the fanatic, bringing the "comfort" of death to some who do not clearly want it, then to others who "would really be better off dead," and finally, to classes of "undesirable persons," which might include the terminally ill, the permanently unconscious, the severely senile, the pleasantly senile, the retarded, the incurably or chronically ill, and perhaps, the aged. . . . In the current environment, it may well prove convenient—and all too easy—to move from recognition of an individual's "right to die" (to us, an unfortunate phrasing in the first instance) to a climate enforcing a "duty to die."

Siegler & Weisbard, at 130–31. I share this concern.

They conclude on this note:

The issue is complicated, the tradition of medicine long, and therefore, a slow and conservative approach would seem advisable.

Siegler & Weisbard, at 131.

Engrossed Substitute Senate Bill 5401 was considered at length in the 1987 regular session as well as at the first special session of the State Legislature recently concluded. The bill contained amendments to broaden the Natural Death Act (RCW 70.122) to cover terminal patients and comatose patients without hope of recovery who had not signed a "living will" stating their wishes about withholding or withdrawing life support procedures. ESSB 5401 did not pass the Legislature, primarily because of a dispute between the House and the Senate over the provisions in the bill that would have authorized discontinuance of artificial nutrition and hydration.[8] The House supported such provisions and the Senate opposed them.[9]

A great deal of statewide public attention was drawn to this proposed legislation. Press reports closely followed the progress of the bill. Legislative records indicate that numerous individuals and professional health care and hospice people had input into the legislative hearing process. Some of these groups are the following:

Washington State Catholic Conference
Washington State Senior Citizens' Lobby
Nursing Home Registered Nurses
Washington State Nurses Association
Alzheimer's Society of Washington
State Task Force on Life Supports
American Association of Retired Persons
Resident Council of Pierce County Homes
Washington Health Care Association
Group Health Cooperative Senior Caucus
Nursing Home Residents Council

---

[8] See House Bill Report, 50th Legislature (1987), at 3; Senate Bill Report, 50th Legislature (1987), at 2.

[9] See Senate and House versions of Engrossed Substitute Senate Bill 5401, 50th Legislature (1987), at 3, lines 10–12.

Washington State Medical Association
Physicians for Moral Responsibility
Washington State Human Life
National Association of Pro Life Nurses

So far as the appellate record in this case reflects, those caring for the patient in this case have not yet been required to provide her with nourishment or liquids through artificial means. That being so, and because, concurrently with this court, the Legislature has been giving earnest consideration to whether artificial nourishment and hydration may be withheld or discontinued, I would defer to the Legislature on the question of whether artificial nutrition and hydration may be withheld from Barbara Grant in the event she needs it.

I am not convinced that the members of this court and the lawyers before it have a better ability to understand and decide the underlying issue of very basic public policy than have the electorate or their elected representatives in the Legislature. In addition, the legislators have two very real advantages that this court does *not* possess. They have the direct input by phone and letters of the citizens of this state to whom this is literally a life and death issue. The Legislature also has the benefit of being able to hold publicized public hearings on the issue where everyone concerned, including professionals of all types, can be heard and have their views given full consideration. The Legislature enacted the Natural Death Act and if, with the benefit of all its resources, the Legislature can pass a law allowing the withdrawal of food and water while protecting the infirm and helpless, then well and good; if not, that too should tell us something. For these reasons, I consider the Legislature to be the preferred body to deal with this issue and would defer to it.[10]

BRACHTENBACH and DURHAM, JJ., concur with ANDERSEN, J.

---

[10]*See Halvorson v. Birchfield Boiler, Inc.,* 76 Wn.2d 759, 765, 458 P.2d 897 (1969).

GOODLOE, J. (dissenting)—The majority opinion which authorizes Judith Grant to choose for her daughter between the right to withhold life sustaining procedures and the right to life, a right guaranteed by the fourteenth amendment to the United States Constitution, is in direct conflict with this court's duty to preserve life. I fully agree that the right to face an inevitable and imminent death in a manner most consistent with our beliefs and with our dignity as humans is vital. But it is another thing to determine for others how they shall meet their deaths. Accordingly, I would limit the choice to withhold life sustaining procedures to that enunciated by the Legislature—to competent adults making choices in their own behalves. The right to life is too personal to be placed within the ambit of a guardian. Therefore, I dissent.

The majority opinion is the most recent in a series of decisions in which this court judicially moves toward and authorizes passive euthanasia. *See In re Colyer,* 99 Wn.2d 114, 660 P.2d 738 (1983) and *In re Hamlin,* 102 Wn.2d 810, 689 P.2d 1372 (1984). In *Colyer,* a majority of the court affirmed an order, sought by the husband of a woman unable to breathe on her own and in a persistent vegetative state, directing that life support systems be withdrawn. The *Colyer* court acknowledged that the Natural Death Act (NDA) passed by our Legislature did not authorize such a holding. *See Colyer,* at 118; *see also* RCW 70.122. However, it found such authorization in the constitutional right of privacy and the common law right to be free from bodily injury. *Colyer,* at 119–22. In *Hamlin,* the patient was in a persistent vegetative state with no prospect of regaining cognitive functions. The diagnosis of all treating physicians was that withdrawal of life support systems would lead to death in a short time. *Hamlin,* at 815. A majority of the court held that under the circumstances the guardian had the authority to consent to the withdrawal of life support systems. *Hamlin,* at 815. The court, relying on *Colyer,* reasoned that the NDA does not prescribe the exclusive method for withholding or withdrawing life support sys-

tems. *Hamlin,* at 816.

In the present case, the majority moves yet further beyond that authorized by *Colyer* and *Hamlin* so that no longer is it necessary that death be imminent as long as the victim is in the advanced stages of a terminal illness. See majority opinion, at 556. This result is contrary to the legislative dictates of the NDA. Because death no longer need be imminent, the unfortunate result of the majority opinion is that the potential for abuse is increased. Moreover, by authorizing the withholding of intravenous nutrition and hydration, the majority authorizes death by starvation and dehydration. I believe that for all intents and purposes the majority authorizes mercy killing, arguably of a cruel nature.

In support of its decision, the majority quotes *Colyer* as follows:

> A competent patient may refuse treatment under the informed consent doctrine. RCW 7.70.050. Moreover, a competent patient may ensure with a directive that life sustaining treatment will be withheld or withdrawn, should he or she subsequently become incompetent. RCW 70.122.
> An incompetent's right to refuse treatment should be equal to a competent's right to do so.

Majority opinion, at 552–53 (quoting *Colyer,* at 124). The stated basis for the court's reasoning that an incompetent individual should have a right equal to a competent individual to refuse treatment is the constitutional right of privacy. *See Colyer,* at 124; *see also In re Quinlan,* 70 N.J. 10, 41, 355 A.2d 647, 79 A.L.R.3d 205, *cert. denied,* 429 U.S. 922 (1976); *Superintendent of Belchertown State Sch. v. Saikewicz,* 373 Mass. 728, 745, 370 N.E.2d 417 (1977). However, neither *Colyer, Hamlin,* nor the majority provide any in–depth analysis as to why this should be. These decisions all completely ignore the inherent differences between choices made *by* individuals who are competent and choices made *for* individuals who are not. There is no weighing of the fact that with the incompetent the stake in preserving

life is most compelling because of the possibility and dire consequences of a mistake. Moreover, in this case, the majority opinion lacks any rationale to justify stretching the guardian's right to make decisions about another's life from the comatose to the noncomatose.

The majority engages in pure guesswork when it states:

We have previously emphasized that the degree of bodily invasion is a significant factor to consider in determining whether life support systems may be withheld. *Colyer,* at 122–23. This is especially true where a terminally ill patient *may well object* to having his or her life prolonged through the use of tubes and forced injections.

(Italics mine.) Majority opinion, at 560. In the present case, no one testified that Barbara Grant at any time expressed any desire to withhold life sustaining procedures. Moreover, the testimony of relatives and Barbara's priest that this is what she would have wished necessarily includes their own personal value judgments on the quality of her life. Therefore, we do not know Barbara's true wishes on the matter.

The guardian's duty is to "care for and maintain the incompetent or disabled person". *See* RCW 11.92.040(3). This directive is at odds with the majority's result. No doubt Barbara's family has her best interests in mind. Yet, guardians are often and appropriately restricted in matters concerning their wards. *See generally* RCW 11.92. Furthermore, where the preservation of life is concerned courts have often held that parents cannot refuse life saving treatment for their children, no matter how well intentioned. *See In re Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266, *cert. denied,* 454 U.S. 858 (1981), and cases cited therein. This is so even if the parent's reasoning is based on religious grounds. *See, e.g., Jehovah's Witnesses v. King Cy. Hosp. Unit 1,* 278 F. Supp. 488 (W.D. Wash. 1967), *aff'd,* 390 U.S. 598, 20 L. Ed. 2d 158, 88 S. Ct. 1260 (1968); *In re Hamilton,* 657 S.W.2d 425 (Tenn. Ct. App. 1983). I would adhere to the same reasoning with guardians, even those whose wards are adults.

The Legislature, pursuant to the NDA, recognizes that

individuals who are competent should have the right to refuse life sustaining procedures; however, it has not deemed that guardians or others should be allowed to make this choice for others. The legislative findings in the NDA are informative. RCW 70.122.010 provides:

> The legislature finds that adult persons have the fundamental right to control the decisions relating to the rendering of their own medical care, including the decision to have life–sustaining procedures withheld or withdrawn in instances of a *terminal condition.*
>
> The legislature further finds that modern medical technology has made possible the artificial prolongation of human life beyond natural limits.
>
> The legislature further finds that, in the interest of protecting individual autonomy, such prolongation of life for persons with a terminal condition may cause loss of patient dignity, and unnecessary pain and suffering, while providing nothing medically necessary or beneficial to the patient.
>
> The legislature further finds that there exists considerable uncertainty in the medical and legal professions as to the legality of terminating the use or application of life–sustaining procedures where the patient has voluntarily and in sound mind evidenced a desire that such procedures be withheld or withdrawn.
>
> In recognition of the dignity and privacy which patients have a right to expect, *the legislature hereby declares that the laws of the state of Washington shall recognize the right of an adult person to make a written directive instructing such person's physician to withhold or withdraw life–sustaining procedures in the event of a terminal condition.*

(Italics mine.) All attempts by our Legislature to extend the NDA have ended in failure. In the 1987 legislative session both the House and the Senate considered a bill which would have removed restrictions on a terminally ill patient's right to die. *See* Engrossed Substitute Senate Bill (ESSB) 5401. Both the House and Senate versions would have added the following to the NDA:

> *The legislature further recognizes that a person in a terminal condition may not have executed such a written directive and that therefore there is a need to*

*establish a means of authorizing the withholding or withdrawing of life–sustaining treatment in the absence of a written directive.*

ESSB 5401. The failure of the Legislature to extend the NDA demonstrates that, unlike the majority, the Legislature is having a difficult time determining the extent of authority which guardians ought to have in deciding matters of life and death for their wards. An area of particular difficulty is that of intravenous nutrition and hydration. The majority admits that this is an area researchers are just beginning to explore. See majority opinion, at 561–62. Indeed, a significant number of states have enacted statutes which include a prohibition against withholding nutrition and hydration from terminally ill patients. *See* Comment, *Artificial Nutrition and the Terminally Ill: How Should Washington Decide?,* 61 Wash. L. Rev. 419, 421–22 (1986). Nevertheless, with apparent ease, the majority cuts off the debate and concludes that the right to withhold treatment extends to nutrition and hydration.

Furthermore, I am concerned about the majority's emphasis between treatment which merely postpones death and that which results in some measure of recovery. See majority opinion, at 556; *see also In re Colyer,* 99 Wn.2d 114, 122–23, 660 P.2d 738 (1983). The majority has determined that treatment which postpones death is always to be avoided. In the present case, I find this position very troublesome because there is no indication that Barbara Grant is suffering. The fact that her functioning is limited does not mean that it is in her best interest to die. I object to the majority's obvious judgment that Barbara's life is not of value. I believe it is inappropriate for the majority to authorize a guardian to determine that the ward's life is not worth living because the guardian deems that "life" to be negligible. The increasing trend of courts to decide that life of "lesser" quality is not worth living is quite disturbing.

In the present case, the court is imposing its own morality on the public in extending a legislative act. There is no guaranty that the majority's view is generally shared by the

people. I object to the court's establishing philosophical principles in the guise of constitutional interpretation. The Legislature, not the court, is in the best position to decide what safeguards are needed in critical decisions affecting life, especially the life of vulnerable individuals. I would hold that it is the proper body to establish the necessary guidelines to make the important and extremely difficult choices that are raised by cases such as this. *See also In re Hamlin*, 102 Wn.2d 810, 821, 689 P.2d 1372 (1984); *Storar*, at 370. Few areas demand greater judicial wisdom and restraint than the one before us.

Once again, as in *Colyer* and *Hamlin*, the majority strikes a balance which fails to give appropriate weight to the State's interest in preserving life—whether that of the particular patient, or the sanctity of all human life in general. As stated in regard to the most basic of all rights—the right to life:

> The late Chief Judge Lehman once wrote of these rights: "The Constitution is misread by those who say that these rights are created by the Constitution. The men who wrote the Constitution did not doubt that these rights existed before the nation was created and are dedicated by God's word. By the Constitution, these rights were placed beyond the power of Government to destroy." In other words, what the Chief Judge was saying was that the American concept of a natural law binding upon government and citizens alike, to which all positive law must conform, leads back through John Marshall to Edmund Burke and Henry de Bracton and even beyond the Magna Carta to Judean Law. Human beings are not merely creatures of the State, and by reason of that fact, our laws should protect the [right to life] from those who would take his life for purposes of comfort, convenience, property or peace of mind rather than sanction his demise.

*Byrn v. New York City Health & Hosps. Corp.*, 31 N.Y.2d 194, 205–06, 286 N.E.2d 887, 335 N.Y.S.2d 390 (1972) (Burke, J., dissenting), *appeal dismissed,* 410 U.S. 949 (1973).

Accordingly, I would affirm the trial court in this case.

DORE, J., concurs with GOODLOE, J.

Reconsideration denied July 15, 1988.