**COMPASSION IN DYING, a Washington nonprofit corporation, Jane Roe, John Doe, James Poe, Harold Glucksberg, M.D., Abigail Halperin, M.D., Thomas A. Preston, M.D., and Peter Shalit, M.D., Ph.D., Plaintiffs,**

v.

**The STATE OF WASHINGTON and Christine Gregoire, Attorney General of Washington, Defendants.**

**No. C94–119R.**

United States District Court,
W.D. Washington,
at Seattle.

May 3, 1994.

Kathryn L. Tucker, Perkins Coie, Seattle, WA, for plaintiffs.

William Lee Williams, Attorney General's Office, Health Div., Olympia, WA, for defendants.

Todd Maybrown, Allen & Hansen, Karen E. Boxx, Keller Rohrback, Seattle, WA, for amici.

ORDER GRANTING IN PART AND DE-NYING IN PART PLAINTIFFS' MO-TION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT

ROTHSTEIN, Chief Judge.

## I. INTRODUCTION

THIS COURT is asked to rule as a matter of first impression on the constitutionality of the State of Washington's criminal prohibi-

tion against physician-assisted suicide. Specifically, the plaintiffs assert that the Fourteenth Amendment to the United States Constitution guarantees adults who are mentally competent, terminally ill, and acting under no undue influence the right to voluntarily hasten their death by taking a lethal dose of physician-prescribed drugs. Plaintiffs accordingly challenge the constitutionality of RCW 9A.36.060, which makes it a felony to knowingly aid another person in committing suicide. Plaintiffs challenge the statute only insofar as it bans physician-assisted suicide by mentally competent, terminally ill adults who knowingly and voluntarily choose to hasten their death.

The plaintiffs seek both a declaratory judgment striking down the statute as unconstitutional and injunctive relief barring defendants State of Washington and the Washington Attorney General from enforcing the statute. Both plaintiffs and defendants now move for summary judgment.[1]

## II. BACKGROUND

### A. DESCRIPTION OF PLAINTIFFS

The plaintiffs are a coalition of three terminally ill patients, five physicians who treat terminally ill patients, and Compassion in Dying, an organization which provides support, counseling and assistance to mentally competent, terminally ill adults considering suicide.

#### 1. The patients [2]

Jane Roe is a 69–year–old retired pediatrician who has suffered since 1988 from cancer which has now metastasized throughout her skeleton. Although she tried and benefitted temporarily from various treatments including chemotherapy and radiation, she is now in the terminal phase of her disease. In November of 1993, her doctor referred her to hospice care. Only patients with a life expectancy of less than six months are eligible for such care.

Jane Roe has been almost completely bedridden since June of 1993 and experiences constant pain, which becomes especially sharp and severe when she moves. The only medical treatment available to her at this time is medication, which cannot fully alleviate her pain. In addition, she suffers from swollen legs, bed sores, poor appetite, nausea and vomiting, impaired vision, incontinence of bowel, and general weakness.

Jane Roe is mentally competent and wishes to hasten her death by taking prescribed drugs with the help of plaintiff Compassion in Dying. In keeping with the requirements of that organization, she has made three requests for its members to provide her and her family with counseling, emotional support and any necessary ancillary assistance at the time she takes the drugs.

John Doe is a 44–year–old artist dying of AIDS. Since his diagnosis in 1991, he has experienced two bouts of pneumonia, chronic, severe skin and sinus infections, grand mal seizures and extreme fatigue. He has already lost 70% of his vision to cytomegalovirus retinitis, a degenerative disease which will result in blindness and rob him of his ability to paint. His doctor has indicated that he is in the terminal phase of his illness.

John Doe is especially cognizant of the suffering imposed by a lingering terminal illness because he was the primary caregiver for his long-term companion who died of AIDS in June of 1991. He also observed his grandfather's death from diabetes preceded by multiple amputations as well as loss of vision and hearing. Mr. Doe is mentally competent, understands there is no cure for

---

**1.** The court has also received a brief from amici curiae American Civil Liberties Union of Washington; Northwest Aids Foundation; Seattle Aids Support Group; Older Women's League; Gray Panthers of Seattle; Hemlock Society of Washington State; National Organization for Women, Seattle Chapter; Humanists of Washington; National Lawyers Guild, Seattle Chapter; Local 6 of Service Employees International Union; and Temple De Hirsch Sinai. The court hereby GRANTS Northwest Women's Law Center's unopposed motion to participate as an additional amicus curiae.

**2.** To preserve their privacy, the patient plaintiffs have chosen to use pseudonyms. The court also notes that plaintiffs Jane Roe and John Doe have died since this case began. However, for purposes of examining the legal issue raised, the court will set forth their circumstances as they existed at the time the complaint was filed.

AIDS, and wants his physician to prescribe drugs which he can use to hasten his death.

James Poe is a 69–year–old retired sales representative who suffers from emphysema, which causes him a constant sensation of suffocating. He is connected to an oxygen tank at all times, and takes morphine regularly to calm the panic reaction associated with his feeling of suffocation. Mr. Poe also suffers from heart failure related to his pulmonary disease which obstructs the flow of blood to his extremities and causes severe leg pain. There are no cures for his pulmonary and cardiac conditions, and he is in the terminal phase of his illness. Mr. Poe is mentally competent and wishes to commit suicide by taking physician-prescribed drugs.

### 2. The physicians

The five physician plaintiffs all regularly treat terminally ill patients. Dr. Harold Glucksberg is an assistant professor of medicine at the University of Washington School of Medicine and practices oncology, the treatment of cancer, at the Pacific Medical Center in Seattle. He has published dozens of articles in medical journals dealing with cancer.

In his declaration to the court, Dr. Glucksberg states:

Cancer usually progresses steadily and slowly. The cancer patient is fully aware of his or her present suffering and anticipates certain future suffering. The terminal cancer patient faces a future that can be terrifying. Near the end, the cancer patient is usually bedridden, rapidly losing mental and physical functions, often in excruciating, unrelenting pain. Pain management at this stage often requires the patient to choose between enduring unrelenting pain or surrendering an alert mental state because the dose of drugs adequate to alleviate the pain will impair consciousness. Many patients will choose one or the other of these options; however, some patients do not want to end their days either racked with pain or in a drug-induced stupor. For some patients pain cannot be managed even with aggressive use of drugs.

Declaration of Harold Glucksberg, M.D., pp. 3–5.

Dr. John P. Geyman was a professor and chair of the Department of Family Medicine at the University of Washington School of Medicine from 1976 through 1990. He is currently a professor emeritus at the University of Washington and has a private practice in family medicine. Dr. Geyman has published over seventy articles regarding family medicine in medical journals, has written several books in the field, was the founding editor of the *Journal of Family Practice,* and has served as editor since 1990 of the *Journal of the American Board of Family Practice.* Dr. Geyman states to the court that,

in the presence of terminal illness, the shared goal of medical care at some point becomes comfort care rather than cure.

With advancing medical technology, many patients are subject to active and ineffective therapeutic efforts by their physicians, even when an early terminal outcome is not in doubt. As a result, many experience prolonged deaths often involving pain, suffering and loss of dignity. In reaction to this problem, an increasing number of patients want more direct control over the type of care they receive in the last stage of their lives. A subset of dying patients desire to shorten their dying process and thereby avoid a lingering death and associated pain, suffering and loss of dignity.

Terminally ill persons who seek to hasten death by consuming drugs need medical counseling.... Knowing what drug, in what amount, will hasten death for a particular patient, in light of the patient's medical condition and medication regimen, is a complex medical task.

It is not uncommon, in light of present legal constraints on physician assistance, that patients seeking to hasten their deaths try to do so without medical advice. These efforts are often unsuccessful and can cause the patient and family increased anxiety, pain and suffering. Very often, patients who survive a failed suicide attempt find themselves in worse shape than before the attempt.

Declaration of John P. Geyman, M.D., pp. 3–5.

Dr. Thomas A. Preston is currently chief of the cardiology unit at Pacific Medical Center in Seattle. He has published numerous articles and books in the field of cardiology, and has received numerous honors for medical teaching and writing. Dr. Preston regularly treats patients dying from cardiopulmonary diseases, a process which can last several months. Dr. Abigail Halperin practices family medicine and occasionally treats patients with terminal illnesses including cancer and AIDS. Dr. Peter Shalit practices general internal medicine; a substantial number of his patients suffer from HIV infection and AIDS. Both Dr. Halperin and Dr. Shalit are also clinical instructors at the University of Washington School of Medicine.

The five physician plaintiffs all state that they have received requests from terminally ill, mentally competent patients in the final stage of their diseases who wished assistance in hastening death. Although their professional judgments have at times dictated that they should assist such patients, they have all been deterred from doing so by the existence of the Washington statute challenged in this case.[3]

### 3. Compassion in Dying

Compassion in Dying is a Washington nonprofit organization which provides information, counseling and assistance free of charge to mentally competent, terminally ill adult patients considering suicide and to the families of such patients.

Compassion in Dying operates under a written protocol and has strict eligibility requirements for the individuals to whom it provides services. Eligible patients must be considered terminally ill in the judgment of the primary care physician and must be capable of understanding their own decisions. Evaluation by a mental health professional may be obtained to insure that the patient's

request is not motivated by depression, emotional distress or mental illness. A request for assisted suicide must not be the result of inadequate comfort care, nor can it be motivated by a lack of adequate health insurance or other economic concerns. The request must come from the patient personally, in writing or on videotape, and must be repeated three times, with an interval of at least 48 hours between the second and third requests. Requests may not be made through advance directives or by a health care surrogate, attorney-in-fact or any other person.

According to its guidelines, Compassion in Dying will not assist anyone to commit suicide who expresses any ambivalence or uncertainty. If the patient has immediate family members or other close personal friends, their approval must be obtained. If any members of the immediate family express disapproval, Compassion in Dying will not provide assistance with suicide. As an additional safeguard, Compassion in Dying requires the patient to provide medical records. A consulting physician must review them to verify the patient's terminal prognosis and decision-making capability as well as to rule out inadequate pain management as the reason for requesting assisted suicide.

Defendants do not contest the factual declarations by the various plaintiffs, except to deny that the physicians' personal statements of their professional standards are in accord with either the ethical standards or the licensing laws applicable to their profession.

### B. WASHINGTON'S STATUTE PROHIBITING ASSISTED SUICIDES

Washington has no law prohibiting suicide or attempted suicide. However, Washington bans aiding or causing the suicide of another:

A person is guilty of promoting a suicide attempt when he knowingly causes or aids another person to attempt suicide.

---

**3.** Although the statute operates to deter physicians from prescribing drugs for the purpose of hastening death, it does not necessarily deter the patient who requested the drugs from committing suicide by other means. Both Dr. Halperin and Dr. Glucksberg recount personal experiences

with terminally ill patients who killed themselves by violent means after being refused a drug prescription. Declaration of Abigail Halperin, M.D., pp. 4–5; Declaration of Harold Glucksberg, M.D., pp. 5–6.

RCW 9A.36.060(1). Promoting a suicide attempt is a class C felony punishable by imprisonment for a maximum of five years and a fine of up to ten thousand dollars. RCW 9A.36.060(2) and 9A.20.020(1)(c).

## C. DESCRIPTION OF PLAINTIFFS' CLAIMS

All of the plaintiffs assert a facial challenge to the constitutionality of RCW 9A.36.060 prohibiting assisted suicide. However, plaintiffs' specific claims vary because of their differing circumstances. Jane Roe, John Doe and James Poe allege that they, as mentally competent, terminally ill adults with no chance of recovery, have a constitutionally protected liberty interest under the Fourteenth Amendment which gives them the right to commit physician-assisted suicide without undue governmental interference. Thus, they challenge the constitutionality of the statute insofar as it bars physicians from aiding informed, mentally competent, terminally ill adults to commit suicide. They also attack the statute on equal protection grounds.

The plaintiff physicians assert claims on behalf of their mentally competent, terminally ill adult patients who seek to commit suicide with drugs prescribed for that purpose. The physicians also allege that the Fourteenth Amendment protects their right to practice medicine consistent with their best professional judgment, including the right to assist competent, terminally ill adult patients to hasten death by prescribing suitable medication for self-administration by the patient.

Compassion in Dying's alleged organizational purpose is to assist competent, terminally ill adults who wish to commit suicide by self-administering prescription medications. Compassion in Dying contends that such persons have the right to request assistance from its staff members, including counseling and delivering or mixing the drugs that are to be used. Under current Washington law prohibiting any form of assisted suicide, Compassion in Dying fears that it may be criminally prosecuted for its activities in assisting dying persons as they exercise their alleged constitutional right to hasten their own deaths.

## III. LEGAL ANALYSIS

### A. EXISTENCE OF PROTECTED LIBERTY INTEREST

The Fourteenth Amendment to the United States Constitution declares that the state may not "deprive any person of life, liberty, or property, without due process of law." Plaintiffs assert the existence of a liberty interest protected by the Fourteenth Amendment which extends to a personal choice by a mentally competent, terminally ill adult to commit physician-assisted suicide. They contend that individuals in those circumstances have a constitutionally protected right to be free from undue governmental intrusion on their decision to hasten death and avoid prolonged suffering.

#### 1. Liberty Interest under Planned Parenthood v. Casey

The United States Supreme Court has established through a long line of cases that personal decisions relating to marriage, procreation, contraception, family relationships, child rearing and education are constitutionally protected. *Planned Parenthood v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992). As explained in *Casey,*

> [t]hese matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.

*Id.*

The opinion in *Casey* involved a woman's right to choose abortion, and thus did not address the question of what liberty interest may inhere in a terminally ill person's choice to commit suicide. However, this court finds the reasoning in *Casey* highly instructive and almost prescriptive on the latter issue. Like the abortion decision, the decision of a termi-

nally ill person to end his or her life "involv[es] the most intimate and personal choices a person may make in a lifetime" and constitutes a "choice[ ] central to personal dignity and autonomy."

The court in *Casey* spoke of the suffering of the pregnant woman, which "is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, however dominant that vision has been in the course of our history and our culture." *Id. Casey* further acknowledged the deep, heart-felt differences of opinion about the morality of abortion, but recognized that the court's duty is not to impose a particular moral standard:

> Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision. Our obligation is to define the liberty of all, not to mandate our own moral code. The underlying constitutional issue is whether the State can resolve these philosophic questions in such a definitive way that a woman lacks all choice in the matter. . . .

*Id.* at ——, 112 S.Ct. at 2806.

This court is well aware of the similarly divisive controversy about the appropriateness of suicide by the terminally ill. But the underlying constitutional issue is whether the State of Washington can resolve the profound spiritual and moral questions surrounding the end of life in so conclusive a fashion as to deny categorically any option for a terminally ill, mentally competent person to commit physician-assisted suicide. This court concludes that the suffering of a terminally ill person cannot be deemed any less intimate or personal, or any less deserving of protection from unwarranted governmental interference, than that of a pregnant woman. Thus, consonant with the reasoning in *Casey,* such an intimate personal decision falls within the realm of the liberties constitutionally protected under the Fourteenth Amendment.

Defendants point out that the Washington State legislature might, in the future, decide to amend the statute prohibiting all assisted suicide so as to make an exception for physician-assisted suicide. Defendants strongly urge the court to leave this decision to the State legislature, which will in turn reflect the will of the people living in Washington. But where a constitutional right is involved, this court simply may not abdicate its responsibility to face the issue, no matter how difficult or divisive. Under those circumstances, this court is legally bound to recognize the right and determine how it affects the outcome of the case before it.

Defendants also argue that the *Casey* analysis is inapposite because there are significant differences between reproductive rights and assisted suicide. First, defendants contend that the level of personal autonomy is greater in the area of reproductive rights because of the greater level of control that humans have historically been able to exercise over the beginning of life, as opposed to the end of life, which usually results from forces outside individual control. Assuming that defendants' observation is correct, this hardly amounts to a distinction that warrants a different constitutional result.

Second, defendants contend that the competing interests differ in cases involving reproductive rights and assisted suicide. In the former, the ongoing life interest of the woman is pitted against the potential life interest of the fetus. In the latter, the interests of the person who wishes to take his or her own life must be weighed against the interests of similarly situated persons who might be subject to undue influence if assisted suicide were allowed.

The court agrees that the competing interests differ, but concludes that if any comparison can be made between the two types of decisions, both of which are emotionally complicated and fraught with social implications, the abortion situation raises *more* difficult questions about competing interests. In reproductive rights cases, there is not only the interest of the pregnant woman seeking an abortion, but also the potential life interest which cannot speak for itself. By contrast, in the case of assisted suicide involving a competent person, only one life is involved and · that individual can voice his or her wishes.

Third, defendants contend that any system allowing assisted suicide would create the potential for abuse and undue influence, whereas recognizing a right to abortion does not raise the specter of undue influence from others with regard to making a decision to abort. This argument is unpersuasive. One can readily imagine many situations in which a pregnant woman or girl could be subjected to intense pressure from others to get an abortion.

Finally, defendants maintain that reproductive rights analysis differs from assisted suicide issues because of the difference in the level of medical knowledge between the two situations. According to defendants, much more is known about the medical possibilities at the beginning of life than at the end. Even assuming the truth of defendants' argument, it is irrelevant. *Casey* and its progenitors did not base the right to choose abortion on the level of medical knowledge about human reproduction, but on the idea that there is a constitutionally protected "realm of personal liberty which the government may not enter." *Id.* at ——, 112 S.Ct. at 2805. The question for this court is whether the choice to commit physician-assisted suicide falls within that realm. This determination is not dependent on advancements in medical science.

### 2. Liberty Interest under Cruzan v. Director, Missouri Dept. of Health

In addition to *Casey*, the court also finds *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), instructive. In *Cruzan*, the Supreme Court considered whether a competent person has a constitutionally protected liberty interest in refusing unwanted, life-sustaining medical treatment including artificially delivered food and water essential to life. In his majority opinion, Justice Rehnquist acknowledged that this principle "may be inferred from our prior decisions,"

*id.* at 278, 110 S.Ct. at 2851, and that "the logic of the cases ... would embrace such a liberty interest." *Id.* at 279, 110 S.Ct. at 2852. He then assumed for purposes of the case before the Court "that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition." *Id.*[4]

This court is confident that, squarely faced with the issue, the Supreme Court would reaffirm Justice Rehnquist's tentative conclusion in *Cruzan* that a competent person has a protected liberty interest in refusing unwanted medical treatment, even when that treatment is life-sustaining and refusal or withdrawal of the treatment would mean certain death. The question then becomes whether a constitutional distinction can be drawn between refusal or withdrawal of medical treatment which results in death, and the situation in this case involving competent, terminally ill individuals who wish to hasten death by self-administering drugs prescribed by a physician. In other words, is there a difference for purposes of finding a Fourteenth Amendment liberty interest between refusal of unwanted treatment which will result in death and committing physician-assisted suicide in the final stage of life?

The liberty interest protected by the Fourteenth Amendment is the freedom to make choices according to one's individual conscience about those matters which are essential to personal autonomy and basic human dignity. There is no more profoundly personal decision, nor one which is closer to the heart of personal liberty, than the choice which a terminally ill person makes to end his or her suffering and hasten an inevitable death. From a constitutional perspective, the court does not believe that a distinction can be drawn between refusing life-sustaining medical treatment and physician-assisted suicide by an uncoerced, mentally competent, terminally ill adult.

---

4. The court notes that Justice O'Connor's concurring opinion concluded that there is a constitutionally protected liberty interest at stake:

Requiring a competent adult to endure such procedures against her will burdens the patient's liberty, dignity, and freedom to determine the course of her own treatment. Ac-

cordingly, the liberty guaranteed by the Due Process Clause must protect, if it protects anything, an individual's deeply personal decision to reject medical treatment, including the artificial delivery of food and water.

*Cruzan*, 497 U.S. at 289, 110 S.Ct. at 2857.

Based on the reasoning set forth in *Casey* and *Cruzan*, the court concludes that a competent, terminally ill adult has a constitutionally guaranteed right under the Fourteenth Amendment to commit physician-assisted suicide.[5]

## B. STANDARD OF REVIEW

■ Regarding the applicable standard of review, the Supreme Court held in *Casey* that, in order to demonstrate the unconstitutionality of a state statute, plaintiffs had to show that it would "operate as a substantial obstacle" to the exercise of a constitutional right and would, therefore, constitute an "undue burden." —— U.S. at ——, 112 S.Ct. at 2830. Defendants in this case respond that since plaintiffs are bringing a facial challenge to the validity of RCW 9A.36.060, the applicable standard is set forth in *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), which requires plaintiffs to show that "no set of circumstances exists under which the [law] would be valid." The court concludes that the *Casey* "undue burden" standard, set forth by the Supreme Court five years after *Salerno*, controls in this case.

In *Casey*, the joint opinion by Justice O'Connor, Justice Kennedy and Justice Souter held that the appropriate test for a facial challenge to the constitutionality of abortion regulations was whether the "state regulation imposes an undue burden on a woman's ability to make [a] decision" concerning whether or not to procure an abortion. *Ca-sey*, —— U.S. at ——, 112 S.Ct. at 2819. In his partial concurrence, Justice Stevens enunciated the following two-part test which must be met for the regulation to survive constitutional scrutiny: "A burden may be 'undue' either because the burden is too severe or because it lacks a legitimate, rational justification." *Id.* at ——, 112 S.Ct. at 2843 (footnote omitted). Justice Blackmun, according to his partial concurrence, would have required that "a State's abortion restrictions be subjected to the strictest of judicial scrutiny." *Id.* at —— - ——, 112 S.Ct. at 2845-46. Thus, five of the Justices in *Casey* found the "undue burden" standard to be appropriate or would have applied an even higher level of scrutiny to the abortion restrictions at issue in that case.

The Supreme Court in *Casey* stated that "[i]t is settled now ... that the Constitution places limits on a State's right to interfere with a person's most basic decision about family ... as well as bodily integrity," *id.* at ——, 112 S.Ct. at 2806 (citations omitted), and that "the undue burden standard is the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty." *Id.* at ——, 112 S.Ct. at 2820. As in *Casey*, this case concerns matters "involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, ... central to the liberty protected by the Fourteenth Amendment." *Id.* at ——, 112 S.Ct. at 2807. As in *Casey*, the liberty interest at issue in this case is similarly "a

---

5. The court is aware of no other federal cases directly addressing the issue raised in this case. However, two state cases have been brought to the court's attention. In *People v. Kevorkian*, No. 93-11482, 1993 WL 603212 (Wayne Cty. Cir. Ct., Mich.1993) defendant physician was prosecuted for violating a Michigan statute making it a felony to provide the physical means, or to participate in a physical act, by which another person commits suicide. On December 13, 1993, the Circuit Court for Wayne County, Michigan found that the Michigan statute prohibiting assisted suicide was unconstitutional insofar as it infringed on a person's Fourteenth Amendment liberty interest in committing "rational suicide," which the court defined as existing:

when a person's quality of life is significantly impaired by a medical condition and the medical condition is extremely unlikely to improve, and that person's decision to commit suicide is

a reasonable response to the condition causing the quality of life to be significantly impaired, and the decision to end one's life is freely made without undue influence....

*Id.* at 34-35. The case is now pending before the Michigan Court of Appeals.

Another case cited by the defendants is *Donaldson v. Lundgren*, 2 Cal.App.4th 1614, 4 Cal. Rptr.2d 59 (2d Dist.1992). Plaintiff in that case suffered from an incurable brain disease and wished to commit suicide with the assistance of a third person so that his body could be cryogenically preserved and brought back to life in the future when a cure for his disease had been found. The court refused to find that plaintiff had a constitutional right to commit assisted suicide under the circumstances presented. Given the very unusual facts in *Donaldson,* this court does not find the case helpful.

right 'to be free from unwarranted governmental intrusion into matters ... fundamentally affecting a person.'" *Id.* at ——, 112 S.Ct. at 2819 (quoting *Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972)). In addition, the Court in *Casey* referred to the undue burden standard as "a standard of general application to which we intend to adhere." —— U.S. at ——, 112 S.Ct. at 2820.

Since the Supreme Court's decision in *Casey,* three Circuit Courts of Appeals have addressed the possible contradiction between *Salerno* and *Casey* concerning the applicable standard for a facial challenge to the constitutionality of a statute. In addition, Justices O'Connor and Souter have had two occasions to discuss the applicability of the *Casey* undue burden standard.

In *Barnes v. Moore,* 970 F.2d 12 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992), the Fifth Circuit followed the *Salerno* standard, although it acknowledged that this might not be consistent with the standard applied in the joint opinion in *Casey.* Indeed, the *Barnes* court cited Justice Rehnquist's dissent in *Casey* in which he disputes the appropriateness of the undue burden standard set out by the joint opinion. *Barnes,* 970 F.2d at 14.

In contrast, the Third Circuit in *Casey v. Planned Parenthood,* 14 F.3d 848 (3rd Cir. 1994) ("*Casey II*"), stated that the Supreme Court in *Casey* had "set a new standard for facial challenges to pre-viability abortion laws." *Id.* at 863, n. 21. The Third Circuit court concluded that "*Casey* requires only that a plaintiff show an abortion regulation would be an undue burden 'in a large fraction of the cases.'" *Id.*

In denying the application for a stay of the Third Circuit's mandate in *Casey II,* Justice Souter noted that the Third Circuit "Court of Appeals's construction of the opinion and mandate ... is the correct one." *Planned Parenthood v. Casey,* —— U.S. ——, ——,

114 S.Ct. 909, 911, 127 L.Ed.2d 352 (1994). Justice Souter stated that he

> join[ed] the applicants and the courts below in treating the joint opinion in *Casey,* ... to be controlling, as the statement of the Members of the Court who concurred in the judgment on the narrowest grounds.

*Id.* at ——, n. 2, 114 S.Ct. at 910, n. 2 (citations omitted).

In *Fargo Women's Health Org. v. Schafer,* —— U.S. ——, 113 S.Ct. 1668, 123 L.Ed.2d 285 (1993), an application for a stay and injunction was filed with the Supreme Court while the case was pending on appeal before the Eighth Circuit. In denying the application for a stay, Justice O'Connor, joined by Justice Souter, concurred but wrote separately "to point out that [the] denial of relief should not be viewed as signaling agreement with the lower courts' reasoning." *Id.* at ——, 113 S.Ct. at 1669. Justice O'Connor stated:

> In my view, the approach taken by the lower courts is inconsistent with *Casey.* In striking down Pennsylvania's spousal-notice provision, we did not require petitioners to show that the provision would be invalid in *all* circumstances. Rather, we made clear that a law restricting abortions constitutes an undue burden, and hence is invalid, if, "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.... While I express no view as to whether the particular provisions at issue in this case constitute an undue burden, I believe the lower courts should have undertaken the same analysis.

*Id.* at ——, 113 S.Ct. at 1669 (citation omitted) (emphasis in original).[6]

Because the constitutional rights at issue in this case are analogous to those in *Casey* and other decisions using an undue burden

---

6. Despite the language of Justices O'Connor and Souter in the denial of the applications for stays in *Fargo Women's Health Org. v. Schafer* and in *Casey II,* the Eighth Circuit Court of Appeals, in its decision on the merits in the *Fargo* case, analyzed the case before it under both the *Saler-* *no* standard and the *Casey* standard. The Eighth Circuit concluded that, on the facts presented in that case, the result would be the same under either standard. *Fargo Women's Health Org. v. Schafer,* 18 F.3d 526 (8th Cir.1994).

standard[7] for facial constitutional challenges, this court is convinced that the undue burden standard set out in *Casey* is the appropriate standard for determining the constitutional validity of RCW 9A.36.060.[8]

## C. UNDUE BURDEN ANALYSIS

■ Pursuant to the standard set forth in *Casey*, the court will first examine the alleged State interests in maintaining a total prohibition on all assisted suicides, and then will determine whether the challenged statute in this case places a substantial obstacle in the path of individuals seeking to exercise a constitutionally protected right.

### 1. State's Interests

Defendants cite two primary interests furthered by the challenged statute: preventing suicide and protecting those at risk of suicide from undue influence from others who would aid them in completing the act.

#### a. Preventing suicide

In support of the first interest, prevention of suicide,[9] defendants point to statistics concerning the rate of suicide in Washington among various age groups, particularly the young. Obviously, the State has a strong, legitimate interest in deterring suicide by young people and others with a significant natural life span ahead of them.

But this case is not about people for whom suicide would abruptly cut life short. Plaintiffs in this case are people suffering through the final stage of life with no hope of recovery. As to them, preventing suicide simply means prolonging a dying person's suffering, an aim in which the State can have no interest. In other words, the State's legitimate interest in preventing suicide is not abrogated by allowing mentally competent, terminally ill patients to freely and voluntarily commit physician-assisted suicide.

The State's interest in preventing suicide by prohibiting any manner of assisted suicide in actuality arises out of its apprehension of the "slippery slope" problem. The State is concerned that allowing any exception to a total ban will encourage the gradual development of a more permissive attitude toward suicide. That attitude, the State fears, will in turn erode the societal constraints now hindering people from committing suicide themselves or countenancing the thought as an appropriate course of action for others, and will result in more suicides by those temporarily depressed, distraught or mentally disturbed.

The court recognizes the tragedy involved when, for example, suicide ends a young life

7. *See e.g., Maher v. Roe,* 432 U.S. 464, 473–474, 97 S.Ct. 2376, 2382–83, 53 L.Ed.2d 484 (1977) ("[The constitutional right declared in *Roe v. Wade*] protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy."); *Doe v. Bolton,* 410 U.S. 179, 198, 93 S.Ct. 739, 750, 35 L.Ed.2d 201 (1973) ("[T]he interposition of the hospital abortion committee is unduly restrictive of the patient's rights."); *Bellotti v. Baird,* 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976) (state may not "impose undue burdens upon a minor capable of giving an informed consent").

8. This court is persuaded that the Supreme Court analysis in *Casey* applies to the circumstances at issue in this case. However, this court need not address whether the *Casey* undue burden standard is applicable outside the realm of personal liberties of this type.

9. Notably, the statute at issue does not bar suicide, nor does any other Washington statute. *See* Washington Laws of 1975, 1st Ex.Sess. ch. 260, § 9A.36.060, which amended the Washington statute governing suicide by repealing the prohibition against attempting suicide, but retained the prohibition against assisting another in committing suicide. Needless to say, this change in the law did not suggest approval of the act of suicide, but rather a determination that the person compelled to attempt it should not be punished if the attempt proved unsuccessful. *See* Legislative Council's Judiciary Committee, *Report on the Revised Washington Criminal Code* 153 (Dec. 3, 1970); and *Report of the Task Force of the Washington State Bar Association Concerning the Proposed Criminal Code* (Sept. 6, 1974). Thus, a terminally ill patient who commits suicide with a doctor's help has not performed an illegal act; only the doctor's actions are subject to legal censure.

As for the law in other jurisdictions, there is no criminal prohibition against attempting suicide in any state. According to defendants, twenty-eight other states besides Washington currently have statutes barring assisted suicide. Defs.' Memo. in Opp. to Pls.Mot. for Summ.J. and in Supp. of Summ.Judg. for Defs., pp. 6–7 n. 15. Thus, twenty-one states have no legislation specifically criminalizing assisted suicide.

that, with timely and appropriate counseling, could have continued. But despite the general validity of the State's concern, the slippery slope argument cannot prevail in this instance. It may be difficult to define the kinds of assistance which are necessary and should be permitted in order to honor terminally ill patients' protected liberty interest in hastening their death. However, that is not a sufficient excuse for precluding *entirely* the exercise of a constitutional right. The court has no doubt that the legislature can devise regulations which will define the appropriate boundaries of physician-assisted suicide for terminally ill individuals, and at the same time give due recognition to the important public policy concerns regarding the prevention of suicide.

### b. Preventing Undue Influence and Abuse

The State's second stated interest, protecting people from committing suicide due to undue influence or duress, is also unquestionably a legitimate consideration. But it is undisputed that plaintiffs in this case are mentally competent individuals who have reached a decision to commit physician-assisted suicide free of any undue influence. Thus, the plaintiffs and others who make knowing and voluntary choices to commit physician-assisted suicide by definition fall outside the realm of the State's concern.

Moreover, Washington State law permits an individual to refuse or require the withdrawal of life-sustaining treatment. *See* the Natural Death Act, RCW 70.122.010 *et seq.*, which outlines the legal requirements for executing a written directive refusing all life-sustaining medical treatment in the event of terminal illness or permanent unconscious condition. *See also In re Guardianship of Grant,* 109 Wash.2d 545, 747 P.2d 445 (1987); and *In re Guardianship of Hamlin,* 102 Wash.2d 810, 689 P.2d 1372 (1984), in which the Washington Supreme Court recognized the right of a competent, terminally ill adult to refuse life-sustaining medical treatment.

Finally, Washington law also recognizes that decisions about life-sustaining medical treatment may be exercised by an authorized representative holding a durable power of attorney for health care. RCW 70.122.010.

The potential risk of abuse and undue influence is often just as great and may be greater in certain cases for a patient who requests to be disconnected from a life support system. The risk of abuse is especially present if the patient is incompetent and a surrogate is making the decision.[10]

### 2. Existence of Undue Burden

As discussed above, the court must determine pursuant to the *Casey* undue burden standard whether the challenged statute "has the purpose or effect of placing a substantial obstacle in the path" of a person seeking to commit physician-assisted suicide. —— U.S. at ——, 112 S.Ct. at 2820. According to the *Casey* standard, a statute with this purpose is invalid because the means chosen by the state to further its interest in preventing undue influence "must be calculated to inform the person's free choice, not hinder it." *Id.* Moreover, "a statute which, while furthering ... [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Id.*

In this case, the challenged statute not only places a substantial obstacle in the path of a terminally ill, mentally competent person wishing to commit physician-assisted suicide, but entirely prohibits it. There is no question that such a total ban places an undue burden on the exercise of a constitutionally protected liberty interest.

The court finds that neither of the two alleged State interests, preventing suicide and protecting people against undue influence from others, would be impeded by allowing physician-assisted suicide for mentally competent, terminally ill adult patients. By

---

**10.** If the State's concern is determining whether a decision is coerced, the court notes that the law regularly deals with the question of evaluating the voluntariness of decisions. Undoubtedly the legislature can devise regulations which would set up a mechanism for ensuring that people who decide to commit physician-assisted suicide are not acting pursuant to abuse, coercion or undue influence from third parties.

reaching this conclusion, the court does not mean to dismiss the importance or legitimacy of the State's interests in deterring suicide or to suggest that the State has no ability to regulate assisted suicide. Clearly, the State can regulate in this area as long as the regulation does not constitute an undue burden on the exercise of a constitutional right and is reasonably related to a legitimate state interest. *Casey*, —— U.S. at ——, 112 S.Ct. at 2821.

In this case specifically, the court recognizes the legitimacy of the State's interest in preventing undue influence by third parties who may seek to coerce or manipulate a person into committing suicide. But this concern can be answered by devising safeguards and imposing restrictions on physician-assisted suicide to ensure the knowing and voluntary nature of the decision. It is well within the legislative prerogative to enact regulations and restrictions which will ensure that undue influence from third parties plays no part in the choice of physician-assisted suicide.

### D. EQUAL PROTECTION

■ Plaintiffs also assert that RCW 9A.36.060 denies them equal protection of the law as guaranteed by the United States Constitution. The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)). When state laws infringe on constitutionally protected personal rights of some people, but not others similarly situated, those laws are subjected to strict scrutiny and will be sustained only if the classifications are suitably tailored to serve a compelling state interest. *Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254; *see also Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (one-year residency requirement for welfare benefits held to violate equal protection); *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (statute providing for sterilization of "habitual criminals" for "felonies involving moral turpitude" which contained an exception for embezzlers violated equal protection as applied to defendant); *Kramer v. Union Free School Dist.*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (striking down school district election voter qualifications as violative of equal protection). Government action burdening the fundamental rights of one group more than that of another group subjects the classification to strict scrutiny. *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (anti-miscegenation law held to violate equal protection guarantee); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (law prohibiting sale of contraceptives to single persons, but not to married persons, was invalid as underinclusive, invidious distinction).

■ Plaintiffs in this case contend that Washington State law unconstitutionally distinguishes between two similarly situated groups of mentally competent, terminally ill adults. Under current state law, those terminally ill persons whose condition involves the use of life-sustaining equipment may lawfully obtain medical assistance in terminating such treatment, including food and water, and thereby hasten death, while those who also suffer from terminal illnesses, but whose treatment does not involve the use of life support systems, are denied the option of hastening death with medical assistance.[11]

---

11. The parties agree that the Washington State Supreme Court has recognized the right of competent, terminally ill adults to refuse life-sustaining treatment. *See Grant,* 109 Wash.2d 545, 747 P.2d 445 (1987); *Hamlin,* 102 Wash.2d 810, 689 P.2d 1372 (1984); *In re Guardianship of Bowman,* 94 Wash.2d 407, 617 P.2d 731 (1980). *See also In re Guardianship of Colyer,* 99 Wash.2d 114, 119–21, 660 P.2d 738 (1983) (guardian may assert an incompetent individual's personal right to refuse life-sustaining treatment).

In addition, the Washington Natural Death Act, RCW 70.122.010 *et seq.*, states that:
adult persons have the fundamental right to control the decisions relating to the rendering of their own health care, including the decision to have life-sustaining treatment withheld or withdrawn, in instances of a terminal condition or permanent unconscious condition, ...
RCW 70.122.010.

Defendants argue that the distinction between the two groups of competent, terminally ill adults does not violate the Fourteenth Amendment's guarantee of equal protection because death resulting from the removal of life support systems is "natural" and death resulting from medical assistance other than removal of life support is "artificial." Defs.' Mem. in Opp. at 21–22. Defendants assert that the governmental interest in preventing suicide is "not implicated in an individual's refusal of life sustaining treatment," *id.* at 21, but *is* implicated in the context of physician-assisted suicide, and that the compelling state interest requirement is therefore satisfied.

The court finds the two groups of mentally competent, terminally ill adults at issue here to be similarly situated. While the court recognizes that the governmental interest in preventing suicide is a compelling state interest, Washington caselaw and the Washington Natural Death Act have already carved out an exception for terminally ill patients, and others,[12] wishing to terminate life support. Thus, the State has already recognized that its interest in preventing suicide does not require an absolute ban.

This court is not persuaded that the distinction between "natural" and "artificial" death justifies disparate treatment of these similarly situated groups. The distinction between the terminally ill patient who requests that her physician remove the life support systems necessary to maintain her life, and the terminally ill patient whose condition does not require life support systems but who seeks physician-administered aid to end her life, is not a narrowly-drawn classification tailored to serve a compelling state interest. Both patients may be terminally ill, suffering pain and loss of dignity and subjected to a more extended dying process without some medical intervention, be it removal of life support systems or the prescription of medication to be self-administered.

Washington law, by creating an exception for those patients on life support, yet not permitting competent, terminally ill adult pa-

tients such as plaintiffs the equivalent option of exercising their rights to hasten their deaths with medical assistance, creates a situation in which the fundamental rights of one group are burdened while those of a similarly situated group are not. Therefore, this court finds that RCW 9A.36.060 violates the equal protection guarantee of the Fourteenth Amendment.

## E. CLAIMS BY PLAINTIFF PHYSICIANS AND COMPASSION IN DYING

The five physician plaintiffs and Compassion in Dying have all asserted claims on their own behalf in the complaint. However, none of these claims is discussed in the briefs now before the court on the parties' summary judgment motions. Since plaintiffs have failed to brief these issues, the court will not address them.

## IV. CONCLUSION

The court declares RCW 9A.36.060 unconstitutional because it places an undue burden on the exercise of a protected Fourteenth Amendment liberty interest by terminally ill, mentally competent adults acting knowingly and voluntarily, without undue influence from third parties, who wish to commit physician-assisted suicide. The court further declares RCW 9A.36.060 unconstitutional because it violates the right to equal protection under the Fourteenth Amendment by prohibiting physician-assisted suicide while permitting the refusal or withdrawal of life support systems for terminally ill individuals.

The motion for summary judgment filed by plaintiffs Jane Roe, John Doe and James Doe is accordingly GRANTED, and defendants' cross-motion for summary judgment as to those claims is DENIED. The physician plaintiffs' motion for summary judgment is GRANTED insofar as the physicians purport to raise claims on behalf of their terminally ill patients. The physician plaintiffs' motion for summary judgment is DENIED as to their own claims on the grounds that the

---

12. RCW 70.122.010 *et seq.*, the Natural Death Act, is not limited to termination of life support for patients who are terminally ill, but also includes patients who are in a "permanent unconscious state." RCW 70.122.010.

basis for those claims has not been adequately addressed. For the same reason, plaintiff Compassion in Dying's claim on its own behalf is DENIED at this time.

As for the injunctive relief requested by plaintiffs, the court declines to enter an injunction barring defendants from enforcing RCW 9A.36.060.[13]

---

**13.** Defendants also point out that the county prosecuting attorneys, and not defendant Attorney General, have primary responsibility for prosecuting violations of the criminal laws. Therefore, enjoining the Attorney General would be a largely useless exercise. Defs.' Mem. in Opp., pp. 23–24.